STATE, Respondent v. CORNISH, et al., Appellants
(13 N. W.2d 812.)

(File No. 8623. Opinion filed April 7, 1944.)

**Burton Penfold**, of Belle Fourche, for Appellants.

**George T. Mickelson**, Atty. Gen., and **Charles P. Warren**, Asst. Atty. Gen., for Respondent.

POLLEY, J.    Buford Cornish and Manville Purcell above named defendants were prosecuted on an information charging them with robbery.    The trial resulted in a verdict of guilty and judgment sentencing defendants to a term in the penitentiary was entered.    From such judgment they have appealed to this court.

At the opening of the trial the defendants objected to the introduction of any evidence on the ground that Count I of the information on which defendants were tried contains more than one offense.    Count I of the information reads as follows:

"That Buford Cornish and Manville Purcell late of said county, Yeoman, on the 9th day of March, in the year of our Lord One Thousand Nine Hundred and Forty-two, at the County of Butte and State of South, Dakota aforesaid, within the jurisdiction of this Court then and there being, did make an assault in and upon one Joe LaFlamme, and thereby did place him, the said Joe LaFlamme, in bodily fear and danger of his life; and did then and there felonious-

ly and unlawfully take from the said Joe LaFlamme approximately $10.00 in cash, the exact amount being not known by your informer, and one pocket knife; all of the said money and property was then and there in the possession of the said Joe LaFlamme and was then and there the property, goods and chattels of the said Joe LaFlamme; and the said Buford Cornish and Manville Purcell did then and there take from the person and against the will of the said Joe LaFlamme the money and property aforesaid, unlawfully, wilfully, violently and forcibly, and with force and violence, (*) and did then and there unlawfully wilfully, feloniously and forcibly steal, take and carry away all of the said money and property with the intent of the said Buford Cornish and Manville Purcell to deprive the owner thereof." (Defendant Purcell was sometimes called "Buck", and defendant Cornish was sometimes called "Red").

It is conceded that that portion of the information above the asterisk constitutes a good and valid charge of robbery, but it is contended by the defendants that the portion of the information after the asterisk charges another offense, to wit: larceny, and in that way Count I charges more than one offense and therefore Count I is demurrable. But the language used after the asterisk does not charge larceny. By SDC 13.3801, Larceny is "accomplished by fraud or stealth." The taking or gaining possession of the stolen property is accomplished by means of fraud or stealth, i.e. without the knowledge of the owner. But that is not the language nor the purport of the language used after the asterisk in the information. It reads as follows: "* * * and did then and there unlawfully, wilfully, feloniously and forcibly steal, take and carry away all of the said money and property with the intent of the said Buford Cornish and Manville Purcell to deprive the owner thereof." There can be no misunderstanding this complaint; it charges a forcible taking and not by means of fraud or stealth.

Many alleged errors are predicated upon the rulings of the court on the reception and rejection of evidence. Defendants tried to show that LaFlamme, the complaining

witness, was in a highly intoxicated condition at the time he was assaulted by the defendants. There was no error in keeping this evidence out of the record. If LaFlamme had been as drunk as defendants tried to show he was, it would have furnished defendants no justification for making the assault, and the fact of LaFlamme's intoxication was wholly immaterial.

Immediately after making the assault, the defendants were arrested by a police officer and confined in jail. While defendant Cornish was on the witness stand during the trial, the state's attorney on cross-examination, assuming that said defendant had set fire to the jail immediately after being confined therein, asked the defendant if he did not set fire to the jail shortly after being confined. The question was objected to as improper cross-examination and as misconduct on the part of the state's attorney. Several other questions along the same line were asked by the state's attorney. With a few exceptions, objections to these questions were sustained by the court; then on request of counsel for defendants the court admonished the state's attorney not to ask any more questions along that line, and no more such questions were asked, but it is now insisted by counsel for defendants that the asking of such questions constituted such misconduct on the part of the state's attorney as to entitle defendants to a new trial.

■■ Where such conduct is persisted in to the prejudice of the defendants they are entitled to a new trial. State v. Klashtorni, 177 Minn. 363, 225 N. W. 278; State v. Archibald, 204 Iowa 406, 221 N. W. 814; 26 R.C.L. 1021. But after being admonished the state's attorney asked no more such questions. We do not think defendants were prejudiced by the conduct complained of, and counsel for defendants does not appear to have considered said conduct prejudicial at the time, and did not call the matter to the court's attention other than by objection to the introduction of the evidence and did not request the court to direct the jury to disregard the matters that had been injected into the case by the questions asked by the state's attorney; but the

court out of abundance of caution, and on its own motion gave the jury the following special instruction:

"During the course of the trial proceeding in this case some questions were put by the state's attorney to the defendant Buford Cornish, relating to a fire at the city jail at or about the time when said defendant was held at said jail. You are instructed that you shall wholly dismiss from your minds the mentioning of the jail fire as there is no evidence in the case tending to establish that there was any connection whatever between a jail fire and Buford Cornish or his conduct at any time."

This, we believe, cured the error, if there had been error committed. State v. Waitman, 42 S. D. 5, 172 N. W. 504.

█ It is next contended by defendants' counsel that the evidence is insufficient to support the verdict. This contention can best be answered by setting out a portion of the testimony of Joe LaFlamme, the complaining witness. While Mr. LaFlamme had his residence in the town of Belle Fourche, he worked out for different farmers and ranchers in the vicinity tending stock and herding sheep. On the 9th day of March, 1942, he came to town from where he was working. He was addicted to the use of intoxicating liquor and immediately on arriving in town he proceeded to get drunk. He was acquainted with both of the defendants and saw them both during that afternoon and along between nine and ten o'clock that evening he was walking up street when Cornish overtook him and took him by the arm and they walked along together until they reached Joe Johnson's cafe. They stopped, and at Cornish's request, some bystander went in the cafe and told Purcell that Cornish was outside waiting for him. Purcell came out immediately and when he came out Cornish was on LaFlamme's left side and Purcell on his right side and one of them said they wanted to give him a drink.

LaFlamme testified:

A. "Red (Cornish) was on my left-side and Buck (Purcell) on the right-side and they said they wanted to give

me a drink and they took me around the corner and asked me if I wanted a drink.

"Q. You went around the side of there? A. Yes.

"Q. What did you do after you went around that corner? A. They had their arms around me and we walked around the corner in that alley and—

"Q. And, what happened then? A. I felt them jerk my jacket pocket, and he gave such a jerk, Red did, and I went off that way."

"A. Well, Red stopped on this side of me, kind of that way, and him this side—

"A. And, Red was on the left and stepped behind me and Buck stepped in front of me and hit me in the mouth, Purcell did, and Red hit me over this left eye with something.

"Q. Do you know what he hit you with? A. No. I don't; something pretty hard.

"Q. What happened after they hit you? A. I was laying there and the law (police officer) came in there then, it was probably a minute or two minutes, and picked me up.

"Q. * * * I will ask you what you had in your possession or on your person? A. I had about ten dollars; around about ten dollars in my jacket and a pocket knife in this pocket (indicating his left pants pocket).

"Q. And, after this was over, did you make any examination of your pockets? A. The law (police officer) did; yes.

"Q. I asked you if you did? A. Yes.

"Q. What did you find? A. I didn't have anything. I only had my teeth, my broken teeth in my hand.

"Q. I take it your pocket knife and money was gone? A. I had three pennies.

"Q. From there where did you go—What happened? A. They put me in the car.

"Q. Don't say they—who put you in the car? A. The night cop and Hartwell, and they went in Joe Johnson's cafe and got this Buck or Purcell, and Red, and brought them out and put them in the car with me.

"Q. Where did they take you? A. They took them down to the jail and then took them on in and searched their pockets.

"Q. And, then, where did you go later after that? A. Then, we drove up to Hi's and got him.

"Q. By 'Hi', you mean Mr. Hantz, the policeman? A. Yes, and then he called up Threadgold.

"Q. Who is Threadgold? A. Dr. Threadgold.

"Q. Did Dr. Threagold then treat your injuries? A. Yes, and then they brought me up to the doctor's office and he come in and sewed my eye up.

"Q. Just what were your injuries? A. They took three stitches in it; right here (indicating).

"Q. That is your left eye? A. Yes.

"Q. Did you have any other injuries? A. Well, yes; my lips were cut and my teeth broke.

"Q. Those were the teeth you referred to as being the teeth you had in your hand when you were getting up? A. Yes, sir.

"Q. Mr. LaFlamme, I show you the knife which I have asked the reporter to mark as the State's Exhibit '1' and ask you to examine that? A. I'll have to put my glasses on.

"Q. Very well—I will ask you if you have ever seen this State's Exhibit '1' before? A. You mean since they took it?

"Q. What do you mean 'since they took it'? A. I mean —well, I don't know how to answer that Mr. Overpeck.

"Q. I will ask you if you ever saw this knife before at any time in your life? A. Yes.

"Q. Where have you seen it? A. Why, I used to own it.

"Q. This was your knife? A. Yes, sir, it was.

"Q. Was this knife in your possession at the time you walked around in back of the cafe with these two defendants? A. Yes, sir.

"Q. And, this is the first time you have seen the knife since that occasion? A. Yes."

Purcell admitted that he struck LaFlamme repeatedly while he was lying on the ground in the alley, but both de-

fendants denied that Cornish struck him at all, or that either of them picked LaFlamme's pockets. But under the instructions of the court the jury believed LaFlamme's testimony and the evidence is sufficient to support the verdict.

The judgment appealed from is affirmed.

All the Judges concur.